**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

NEW JERSEY MANUFACTURERS
INSURANCE COMPANY,

     Plaintiff,

        v.

J. SCOTT BRADY, Individually, and
BRADY & GRABOWSKI, P.C.

     Defendants.

CIVIL ACTION NO. 3:15-CV-02236

(JUDGE CAPUTO)

## MEMORANDUM

Presently before the Court is a Motion for Partial Summary Judgment (Doc. 18) filed by Plaintiff New Jersey Manufacturers Insurance Company ("NJM"), and a Motion to Compel Production of Documents (Doc. 31) filed by Defendants J. Scott Brady, Esquire ("Brady") and Brady & Grabowski, P.C. (collectively, "Defendants"). NJM's Complaint (Doc. 1) alleges that Brady committed legal malpractice when he represented NJM with respect to an Underinsured Motorist (UIM) claim brought by nonparty Gary Wells ("Wells") against his insurer, NJM (the "Wells claim"). Defendants' Answer (Doc. 10) raises multiple affirmative defenses, including a contributory negligence defense based on NJM's alleged bad faith handling of the Wells claim. In response, NJM filed the instant Motion for Partial Summary Judgment, seeking to strike this affirmative defense and preclude further discovery related to its alleged bad faith handling of the Wells claim. Defendants subsequently filed the instant Motion to Compel, seeking production of documents and communications related to the Wells claim that NJM contends are privileged. NJM's Motion for Partial Summary Judgment will be granted in part and denied in part. Because the Court finds that NJM's exposure to bad faith liability is relevant to the issue of damages, NJM will not be precluded from pursuing discovery on NJM's bad faith handling of the Wells claim. However, as explained below, the Court will strike Defendants' contributory negligence defense only to the extent that the defense is based on conduct that is not causally related to the arbitration award.

Additionally, after conducting an *in camera* review of the NJM file, the Court finds that, with the few exceptions noted below, the documents are properly withheld from discovery on the basis of the privilege claimed. Moreover, the Court finds that NJM has not waived its attorney-client privilege or work-product protection with respect to the withheld documents in the NJM file. However, NJM's privilege log entries for the Curtin & Heefner file are insufficiently detailed for the Court to determine whether the documents withheld on the basis of attorney-client privilege and/or work-product protection are actually privileged from discovery. NJM therefore must supplement its privilege log as detailed below. Defendants' Motion to Compel thus will be granted in part and denied in part.

## I. Relevant Factual Background

The facts presented in the record, viewed in the light most favorable to Defendants, are as follows[1]:

Plaintiff NJM is a New Jersey corporation authorized to issue automobile insurance policies in Pennsylvania. (Compl. ¶ 1, Doc. 1.) Defendant J. Scott Brady is a licensed Pennsylvania attorney who practiced at the law firm Defendant Brady & Grabowski, P.C. when he represented NJM. (*Id.* ¶¶ 2-3.) The instant dispute arises out of Brady's representation of NJM with respect to a UIM claim brought by one of its insureds, Gary Wells. Specifically, NJM contends that Brady negligently handled the arbitration between NJM and Wells (the "Wells arbitration") and continued to act negligently in the steps he took

---

[1]     Local Rule 56.1 requires the nonmoving party's statement of facts to respond to the numbered paragraphs set forth in the moving party's statement. L.R. 56.1. The responsive statement "shall include references to the parts of the record that support the statements." *Id.* Defendants' counterstatement of facts contains denials that are unsupported by adequate citations to the record. (*See* Doc. 24.) Therefore, the Court will adopt Plaintiff's statement of facts that are supported by sufficient citations to the record, except for those facts clearly disputed by Defendants with adequate record references. *See* L.R. 56.1 ("All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party."). *See generally United States ex rel. Paranich v. Sorgnard*, 286 F. Supp. 2d 445, 448 n.3 (M.D. Pa. 2003)

after the arbitration panel issued its award. (*See id.* ¶¶ 61-63, 74-76.) NJM also claims that Brady breached his fiduciary duties in his handling of the Wells claim, including his handling of the Wells arbitration. (*Id.* Count II.)

Nonparty Gary Wells was injured in a car accident on February 20, 2012. (Pl.'s Statement of Undisputed Facts ("PSUF") ¶ 1, Doc. 19.) NJM provided automobile insurance to Mr. Wells, including Underinsured Motorist (UIM) coverage. (*Id.* ¶ 2.) Under the policy, UIM coverage was limited to $2 million. (*Id.* ¶ 3.) Mr. Wells was represented by the law offices of Lenahan & Dempsey, who submitted a claim on behalf of Mr. Wells to NJM under the UIM provisions of his policy. (*Id.* ¶ 5.) On March 11, 2014, Defendant J. Scott Brady and his firm, Defendant Brady & Grabowski, P.C., were retained to represent NJM with respect to the Wells claim. (*Id.* ¶ 7.) The parties agreed to a common law arbitration before a three-person arbitration panel. (*Id.* ¶ 8; *see* Ex. F, at 4:2-6, Doc. 19.) The arbitration was scheduled to take place on August 19, 2014 in Lackawanna County, Pennsylvania. (PSUF ¶ 8.) On August 14, 2014, John Lenahan, Mr. Wells's attorney, sent Brady a letter that stated: "Enclosed you will find a submission I propose we give the arbitrators in a sealed envelope, to be opened after their deliberations have been completed." (Ex. G, Doc. 19.) The letter further stated that Lenahan was "including the UIM policy limit disclosure" in the proposed sealed envelope "without waiving [plaintiffs'] argument that the arbitrators should be advised of the UIM limits in advance of the arbitration proceedings. . . ." (*Id.*) However, the arbitrators were not made aware of the UIM policy limits prior to issuing their decision. (PSUF ¶ 13.)

For purposes of the arbitration, NJM stipulated that the driver who caused Wells's injuries was negligent. (PSUF ¶ 10.) The only issues before the arbitration panel were the scope and extent of Wells's injuries. (*Id.* ¶ 11.) The issue of NJM's alleged bad faith handling of Wells's UIM claim was not at issue in the arbitration. (*Id.* ¶ 12.) Brady never requested the arbitration panel to mold an award in excess of the $2 million policy limit to match that limit. (*Id.* ¶ 14.) On August 20, 2014, the arbitration panel issued an award in favor of Mr. Wells for $5,921,117. (*Id.* ¶ 15; Ex. J, Doc. 19.) This award was for compensatory damages only,

and exceeded the $2 million policy limit by $3,921,117.[2] (PSUF ¶ 16.) The award did not encompass extra-contractual damages, including damages related to any bad faith on the part of NJM. (*Id.*)

On September 2, 2014, Brady filed a Petition with the arbitration panel seeking reconsideration, correction, modification, and/or clarification of the award pursuant to 42 Pa. Cons. Stat. Ann. § 7311. (*Id.* ¶ 17; *see* Ex. K, Doc. 19.) The Petition sought to modify the award, arguing that the amount was arbitrary. (PSUF ¶ 17.) The Petition did not provide the UIM policy limits or expressly request the arbitration panel to mold the award to the policy limits. (*See* Ex. K, Doc. 19.) On September 15, 2014, Brady sent a letter to NJM in which he opined that, because he had "no doubt" that a court would interpret Wells's policy language as calling for a common law arbitration rather than a statutory arbitration, NJM had very narrow grounds on which to appeal the arbitration award, none of which he believed applied to the Wells arbitration. (Ex. V, Doc. 25-1.) Brady thereafter withdrew the Petition on September 16, 2014 (Ex. L, Doc. 19) and filed an appeal of the award in the Court of Common Pleas of Monroe County, Pennsylvania on September 19, 2014. (PSUF ¶¶ 19-20.) The appeal did not explicitly use the term "molding" in its request for modification of the Wells arbitration award. (*See* Ex. M, Doc. 19.) On September 23, 2014, Lenahan filed a Petition to Confirm Common Law Arbitration Award and Enter Judgment in the Court of Common Pleas of Lackawanna County–the same county where the arbitration took place. (PSUF ¶ 22.) Around this time, NJM discharged Brady and retained new counsel, Curtin & Heefner, to handle the challenge to the Wells arbitration award. (*See* Stein Aff. ¶ 3, Doc. 36-1.) On October 14, 2014, Curtin & Heefner on behalf of NJM filed an Amended Petition in Monroe County requesting the award be molded to the $2 million policy limits, as well as a Motion to Transfer Venue from Monroe County to Lackawanna County. (Ex. 7, p. 3598, Doc.

---

[2]     The arbitrators awarded Wells $ 2,646,117 in economic damages and $ 3,300,000 in noneconomic damages, including $300,000 for Mr. Wells's wife for loss of consortium. (Ex. J, Doc. 19.) The award was offset by $25,000 for a payment made by the tortfeasor. (*Id.*)

23.)

Lenahan had also drafted a complaint that alleged NJM acted in bad faith in handling the Wells claim. (PSUF ¶ 23; Ex. O, Doc. 19.) Lenahan sent the draft bad faith complaint to Bonnie Stein of Curtin & Heefner on October 23, 2014. (Ex. 13, Doc. 23.) In this email, Lenahan informed Stein that he was "likely" to file the complaint before the end of the following day (October 24, 2014). (*Id.*) On October 26, 2014, Stein emailed Nathan Buurma and Jeffrey Bartolino, members of NJM's in house legal team, a copy of the bad faith complaint. (Ex. 3, Doc. 23.) In that email, Stein stated that she wanted to meet "ASAP" to "speak about some significant developments" and "go over major concerns and the possible benefits of this going [to] the October 30, 2014 Mediation." (*Id.*) Additionally, an email from Buurma concerning the Wells claim sent on October 27, 2014 demonstrates that NJM's legal team was actively strategizing over its ability to mold the arbitration panel's award to the policy limits, as well as its potential exposure to bad faith liability. (Ex. 4, Doc. 23.) On October 28, 2014, Buurma sent a notice to Brady informing him that NJM planned to file a malpractice suit against him in connection with his handling of the Wells arbitration. (Ex. 5, Doc. 23.) A mediation between NJM and Wells was scheduled for October 30, 2014. (*Id.* Exs. 6-7.) Both parties' mediation memoranda dealt extensively with the issue of NJM's bad faith handling of the Wells claim before and after the arbitration. (*See id.*)

On November 10, 2014, NJM and Wells executed a release and settlement agreement. (Ex. P, Doc. 19.) NJM contends that it reasonably believed Brady's failure to submit the policy limits to the arbitration panel or otherwise request a molding of the award would have resulted in the full amount of the arbitration award being confirmed in court, and that its pending motions seeking to reduce the award would have been futile. (*See* PSUF ¶ 24.) NJM therefore agreed to pay Wells the full arbitration award plus interest in exchange for the release of all claims against NJM relating to this matter, including any claims for bad faith. (Ex. P ¶ 1, Doc. 19.) The agreement also states: "[T]he Payment referenced in this Agreement is made by NJM solely for the purposes of avoiding the uncertainty, nuisance and expense of litigation, and [] no part of the Payment is for bad faith or extra-contractual

liability." (*Id.* ¶ 5.)

NJM subsequently filed its malpractice suit on November 20, 2015. The Complaint alleges that Brady handled the Wells arbitration negligently, and committed legal malpractice by failing to present the arbitration panel with the UIM policy limits and failing to raise the issue of molding the award to the policy limits before the arbitration panel or any subsequent court. NJM seeks damages totaling the difference between its policy limits ($2 million) and the Wells arbitration award ($5,921,117). Defendants filed their Answer on February 1, 2016, in which they raised multiple affirmative defenses, including:

> NJM acted in Bad Faith in violation of 42 Pa.C.S. section 8371 and knew that it had significant bad faith exposure for it's [sic] conduct, some of which is outlined in Lineman's [sic] 125 page draft Bad Faith Complaint submitted to NJM on October 26th through NJM's counsel before the mediation that settled the UIM and Bad Faith cases on or about October 30, 2014. As specifically outlined in the draft Bad Faith Complaint, NJM repeatedly ignored demands for the policy limits before Brady was retained, after Brady was retained (but prior to Arbitration) and after Arbitration in spite of repeated demands that the policy limit and only the policy limit be paid.

(Answer ¶ 3; *see also id.* ¶ 1 ("The Plaintiff's claims are barred by NJM's fault or their contributory negligence . . . .").) NJM argues that a "bad faith contributory negligence defense" should be stricken because NJM's alleged bad faith "bears no causal nexus to the claims and damages asserted by NJM against Brady. . . ." (*See* Pl.'s Br. in Supp. 7, Doc. 20.) A hearing was held on December 22, 2016, and the motions are now ripe for disposition.

## II. Legal Standards

### A.   Motion for Partial Summary Judgment on an Affirmative Defense

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). As such, summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party

is entitled to a judgment as a matter of law." *Wright v. Corning*, 679 F.3d 101, 105 (3d Cir. 2012) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. *See Edelman v. Comm'r of Soc. Sec.*, 83 F.3d 68, 70 (3d Cir. 1996). Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Anderson*, 477 U.S. at 247-48. An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 251 (3d Cir. 2010). The moving party may present its own evidence or, where the nonmoving party has the burden of proof, simply point out to the court that "the nonmoving party has failed to make a sufficient showing on an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Courts differ as to whether a motion for summary judgment under Rule 56 or a motion to strike under Rule 12(f) "is the appropriate procedure by which to challenge an affirmative defense." *Prof'l Buyer's Guild, LLC v. Ace Fire Underwriter Ins. Co.*, No. 06-2127 (GEB), 2007 WL 3227183, at *1 n.1 (D.N.J. Oct. 30, 2007). Here, because both parties refer to matters outside of the pleadings, it is appropriate for the Court to treat NJM's Motion as one for partial summary judgment rather than a motion to strike. *See United States v. Manzo*, 182

F. Supp. 2d 385, 395 n.6 (D.N.J. 2000). "The effect of a grant of partial summary judgment in this situation is that the affirmative defense[] [is] stricken." *Kantner v. Sears & Roebuck, Inc.*, 5:15-CV-01039, 2016 WL 739187, at *2 (E.D. Pa. Feb. 25, 2016) (citation omitted).

## B.     Legal Malpractice Claim

"A legal malpractice lawsuit arising out of the conduct of underlying litigation involves a 'case within a case.'" *Scaramuzza v. Sciolla*, No. Civ.A.04-1270, 2006 WL 557716, at *7 (E.D. Pa. Mar. 3, 2006). Under Pennsylvania law,[3] "an allegedly aggrieved client must establish three elements in order to recover for legal malpractice": (1) the employment of the attorney or other basis for duty; (2) the failure of the attorney to exercise ordinary skill and knowledge; and (3) the attorney's negligence was the proximate cause of damage to the plaintiff. *Rizzo v. Haines*, 555 A.2d 58, 65 (Pa. 1989). This requires "proof of actual loss rather than a breach of a professional duty causing only nominal damages, speculative harm or the threat of future harm." *Kituskie v. Corbman*, 714 A.2d 1027, 1030 (Pa. 1998). Stated differently, a plaintiff may recover as damages only the actual losses he suffered as a result of the attorney's misconduct. *Duke & Co. v. Anderson*, 418 A.2d 613, 617 (Pa. Super. Ct. 1980); *see Ammon v. McCloskey*, 655 A.2d 549, 552 (Pa. Super. Ct. 1995) ("Hence, until the client suffers appreciable harm as a consequence of his attorney's negligence, the client cannot establish a cause of action for malpractice.") (citation omitted). "Damages are speculative only if the uncertainty concerns the *fact* of damages rather than the amount." *Liberty Bank v. Ruder*, 587 A.2d 761, 765 (Pa. Super. Ct. 1991) (citation omitted) (emphasis in original); *see Ammon*, 655 A.2d at 553 (holding that the entry of a negligently-obtained judgment constitutes an actual loss giving rise to a cognizable malpractice claim, even if execution of the judgment does not occur, so long as the aggrieved client is able to demonstrate it incurred other actual damages).

---

[3]     Pennsylvania substantive law applies to this diversity action. *See Nat'l Grange Mut. Ins. Co. v. Goldstein, Heslop, Steel, Clapper, Oswalt & Stoehr*, 142 Fed. Appx. 117, 120 (3d Cir. 2005).

In a legal malpractice case in which the underlying action involved litigation, actual losses are usually "measured by the judgment the plaintiff lost in the underlying action[,] and the attorney who negligently handled the underlying action is the party held responsible for the lost judgment." *Kituskie*, 714 A.2d at 1030. However, it is inequitable for an aggrieved client to obtain a judgment against his attorney for an amount that is greater than what the client could have obtained from the third party in the underlying action. *Id.* Such a scenario would allow the client to "receiv[e] a windfall at the attorney's expense." *Id.* (citation omitted).

The plaintiff bears the burden of proving damages and establishing that it would have succeeded on its defense in the underlying action but for its attorney's negligence. *Duke*, 418 A.2d at 618.

## C.   Contributory Negligence in Legal Malpractice Cases

"[T]he negligence of a client may be raised as an affirmative defense by an attorney in a legal malpractice action that is based on a theory of negligence." *Gorski v. Smith*, 812 A.2d 683, 700 (Pa. Super. Ct. 2002). Because legal malpractice actions "do not involve bodily injury or damage to property," they fall outside the scope of Pennsylvania's Comparative Negligence Act, and the doctrine of contributory negligence therefore applies. *Id.* at 702. "Contributory negligence is conduct on the part of a plaintiff which falls below the standard [of care] to which he should conform for his own protection and which is a legally contributing cause, cooperating with the negligence of the defendant, in bringing about the plaintiff's harm." *Id.* at 703 (citation omitted). Under the doctrine of contributory negligence, "[i]t does not matter how slight the evidence of plaintiffs' contributory negligence is. . . . Any contributory negligence by the plaintiffs would be a complete bar to recovery." *Rizzo v. Michener*, 584 A.2d 973, 978 (Pa. Super. Ct. 1990). However, a plaintiff "may not be found contributorily negligent unless it appears that he engaged in conduct that was both negligent and a legal cause of his injury." *Fahringer v. Rinehimer*, 423 A.2d 731, 733 (Pa. Super. Ct. 1980); *see Angelo v. Diamontoni*, 871 A.2d 1276, 1280 (Pa. Super. Ct. 2005) ("[T]he burden to establish the plaintiff's conduct as a contributing factor in his injury rests with the defendant, who must show both the negligence of the conduct alleged and the causal

relationship of that conduct to the injuries for which damages are sought.").

## III. Discussion

### A.    NJM's Motion for Partial Summary Judgment

NJM's Motion for Partial Summary Judgment is premised on the notion that there is no causal relationship between NJM's purported contributorily negligent conduct–NJM's bad faith handling of the Wells claim–and the damages that NJM seeks from the Defendants–the delta between the arbitration award and the policy limits. (*See* Pl.'s Br. in Supp. 9-10, Doc. 20.) The reasoning underlying NJM's position proceeds as follows: First, NJM correctly argues that the arbitration award issued in favor of Wells was for compensatory damages only and in no way predicated on NJM's bad faith conduct. As such, NJM's bad faith conduct was not factored into the amount of the arbitration award. Second, NJM correctly advances that the arbitration award exceeded the $2 million limit in Wells's UIM policy by approximately $3.9 million. Third, NJM argues that, at the time Lenahan filed the Petition to Confirm the arbitration award in the court of common pleas, NJM had no legal recourse to avoid paying the arbitration award in full. Thus, the entire arbitration award was going to be confirmed by the court and on appeal as a matter of law. NJM therefore elected to settle with Wells instead of engaging in a futile legal challenge. Furthermore, NJM specifically enumerates a clause in the settlement agreement that states "no part of the Payment is for bad faith or extra-contractual liability" as evidence that the settlement payment was contemplated to extinguish NJM's liability with respect to Wells's UIM claim only. (*See* Pl.'s Br. in Supp. 10-11, Doc. 20.) Fourth, NJM contends that it now simply seeks liquidated damages–the difference between the arbitration award that it was bound to pay in full and the policy limits. Based on this foundation, NJM posits that the Court will ultimately have to decide whether NJM would have lost its challenge to the Petition to Confirm the arbitration award and on any subsequent appeal, and therefore have been bound to pay the full amount of the award as a matter of law due to Brady's negligence. (Pl.'s Reply Br. 3, Doc. 25.) Because NJM's bad faith handling of the Wells claim does not affect this inquiry, NJM argues that partial summary judgment on this affirmative defense is warranted.

The Court concludes that NJM's exposure to bad faith liability is relevant to the issue of the damages it seeks in this case. As such, for the reasons that follow, the Court will not preclude discovery on NJM's bad faith conduct. However, NJM's Motion for Partial Summary Judgment will be granted in part, and the Court will strike Defendants' bad faith contributory negligence defense only to the extent that this defense is based on NJM's conduct that is not causally related to the arbitration award.

1.    **NJM's Exposure to Bad Faith Liability is Relevant to the Issue of Damages**

In reaching this conclusion, the Court notes first and most significantly that NJM never paid the Wells arbitration award. Instead, NJM elected to satisfy its obligation on the Wells UIM claim by settling with its insured. Stated differently, even if Brady is found to have been negligent, and even if that negligence would have caused NJM to be bound to pay the entire arbitration award after review in court, NJM never in fact paid this award. Accordingly, NJM cannot directly claim that its damages are the difference between the arbitration award and its policy limits because NJM never suffered an actual loss as a result of paying that award. *See Duke & Co. v. Anderson*, 418 A.2d 613, 617 (Pa. Super. Ct. 1980) (holding that proof of actual loss is necessary in a legal malpractice cause of action); *see also Kituskie v. Corbman*, 714 A.2d 1027, 1030 (Pa. 1998) (noting that a speculative harm does not constitute cognizable damages in a malpractice action). NJM can, however, attempt to prove that the settlement payment, or some portion of it, was made in lieu of direct satisfaction of the arbitration award, assuming NJM first demonstrates that the award would have been confirmed in court.

Second, when read in a light most favorable to Defendants, the record suggests that the settlement payment was made in part to extinguish NJM's exposure to bad faith liability.[4] At the hearing on December 22, 2016, counsel for NJM acknowledged that NJM was

---

[4]    The Court does not decide whether a portion of the settlement payment was in fact made to extinguish NJM's bad faith liability at this time.

motivated by the desire to shield itself from bad faith liability when it entered into the settlement agreement with Wells. The record also demonstrates this fact independently of counsel's statement to the Court. An email sent from Bonnie Stein of Curtin & Heefner to NJM's in-house counsel on October 26, 2014 evidences that Stein had recently received the bad faith complaint from Wells's attorney, who stated that he planned to file that complaint "before the end of business tomorrow [October 24, 2014]." (Exs. 3, 13, Doc. 23.) The email indicates that Stein believed the development involving the bad faith complaint needed to be addressed "very quickly," as there was only a "limited window of opportunity to go to [the October 30, 2014] mediation." (Ex. 3, Doc. 23.) A subsequent email sent on October 27, 2014 by Nathan Buurma, in-house counsel for NJM, demonstrates that NJM's legal team was strategizing over its exposure to bad faith liability right before the parties began the October 30, 2014 mediation that culminated in the agreement to settle with Wells. (Ex. 4, Doc. 23.) Furthermore, both parties' mediation memoranda dealt extensively with the issue of NJM's bad faith liability right before the parties settled. (Exs. 6-7, Doc. 23.) And it is undisputed that Wells released all claims against NJM under the settlement agreement, including claims sounding in bad faith. (*See* Ex. P, Doc. 19.) Although NJM attempts to elevate language in the agreement stating that "no part of the payment is for bad faith or extra-contractual liability," Defendants were not a party to that agreement and are not bound by those terms.[5] In sum, the record indicates that NJM settled with Wells in order to both

---

[5]     Settlement agreements are governed by ordinary principles of contract law. *In re Cendant Corp. Prides Litig.*, 233 F.3d 188, 193 (3d Cir. 2000). "In general, only parties to a contract are bound by its terms." *Hornicek v. Cardworks Servicing, LLC*, No. 10-3641, 2011 WL 2623274, at *2 (E.D. Pa. June 29, 2011) (citing *AT&T Techs., Inc. v. Comm. Workers*, 475 U.S. 643, 648 (1986)). It thus follows that parties to a settlement agreement cannot impose the terms of the contract on one who is a stranger to the agreement. *FCM Grp., Inc. v. Miller*, 17 A.3d 40, 54 (Conn. 2011); *see Hartford Steam Boiler Inspection v. Int'l Glass Prods., LLC*, No. 2:08-cv-1564, 2016 WL 5468111, at *11 (W.D. Pa. Sept. 29, 2016) (noting strangers to a contract generally are not bound by its terms under Pennsylvania law); *Kerrigan v. Phila. Bd. of Elec.*, No. 07-687, 2008 WL 250522, at *9 (E.D. Pa. Jan. 29, 2008) (holding that nonparties to a settlement agreement were not

satisfy the Wells arbitration award and settle the looming bad faith lawsuit.

Third, because there is evidence that NJM settled with Wells in order to satisfy the arbitration award and settle the looming bad faith claim, it logically follows that some portion of the settlement payment compensated Wells for the release of his bad faith claim. In order to ascertain damages properly, Defendants must be allowed to present evidence on the extent of NJM's bad faith liability as bearing on how much of the settlement payment, if any, went to extinguish that distinct liability. *See Fiorentino v. Rapoport*, 693 A.2d 208, 218 (Pa. Super. Ct. 1997) (noting that the amount of damages to be awarded in a legal malpractice action is a question for the jury).

Fourth, NJM could be unjustly enriched if it were allowed to settle two sources of liability and then turn around and have Defendants pay the costs of extinguishing one of those sources that is unrelated to Defendants' representation of NJM. *See Kituskie*, 714 A.2d at 1030 (noting that it would be inequitable to allow a client to obtain a windfall at his attorney's expense in a legal malpractice action). The record suggests that NJM settled both the UIM claim and the looming bad faith lawsuit with Wells for approximately $5.9 million. It now seeks $3.9 million from Brady for mishandling the UIM claim. If successful, NJM would have effectively paid only the policy limits on the UIM claim ($2 million) in satisfaction of potentially both the Wells arbitration award and a bad faith claim. NJM could receive a

---

bound by the terms). Moreover, the Third Circuit has made clear in the context of tax litigation that district courts can look behind the allocation of damages in a settlement agreement to ascertain the payor's true intent. *See Francisco v. United States*, 267 F.3d 303, 322 (3d Cir. 2001) ("It is thus well established that in cases in which the settlement agreement's allocation of damages does not reflect the true nature of the underlying award, the District Court has a duty to look behind the agreement of the parties to discern the true nature of the 'payor's intent' in settling claims."); *see also Peaco v. C.I.R.*, 48 Fed. Appx. 423, 425 (3d Cir. 2002) (noting that district courts should look behind the parties' allocation of damages in a settlement agreement if it appears the allocation is "driven by tax considerations and [does] not reflect the true value of settled claims" (quoting *Francisco*, 267 F.3d at 322)). Given the facts of this case, the Court concludes that it is appropriate to look beyond the language of the settlement agreement to assess NJM's intent.

windfall at Defendants' expense if it were permitted to settle two claims for the price of one.[6]

Thus, the Court finds the fact and extent of NJM's bad faith handling of the Wells claim and concomitant exposure to bad faith liability are directly relevant to the question of the amount of damages it sustained due to Brady's conduct. If NJM is successful on its malpractice claim, it will have to prove actual losses that it suffered as a result of Defendants' negligence. Because NJM did not pay the arbitration award directly, it cannot claim that the excess award is the damages it now seeks. However, if NJM attempts to prove that the settlement payment constitutes actual losses proximately caused by Defendants' negligence, it must also prove with reasonable certainty what portion of the settlement payment in excess of its policy limits was paid to satisfy the arbitration award. Discovery on NJM's exposure to bad faith liability is therefore relevant to the scope of damages NJM alleges to have sustained. And because NJM's bad faith conduct affects the amount of damages sought, the Court will not preclude Defendants from pursuing discovery on NJM's bad faith.

### 2.      NJM's Motion Will Be Granted in Part

Although evidence relating to NJM's alleged bad faith handling of the Wells claim is relevant to the question of damages, the Court concludes that Defendants' affirmative defense of contributory negligence based on NJM's alleged bad faith conduct that is not causally related to the arbitration award fails as a matter of law. Under Pennsylvania law, in order to make out an affirmative defense of contributory negligence, the defendant must show that the plaintiff acted negligently, and that this negligence was "a legally contributing cause" in brining about the plaintiff's complained-of injury. *Gorski v. Smith*, 812 A.2d 683, 703 (Pa. Super. Ct. 2002). In this case, the Court finds the mere fact that NJM allegedly handled the Wells claim in bad faith cannot constitute contributory negligence as a matter

---

[6]      Stated differently, $2 million of the $5.9 million settlement agreement represents the uncontested policy limits that NJM argues it would have paid Wells but for Brady's negligence. The question remains as to what portion of the remaining $3.9 million settled Wells's pending Petition to Confirm the arbitration award in full, and what portion settled the looming bad faith lawsuit.

of law unless this conduct was a legally contributing cause of the arbitration award. NJM is permitted to claim that the arbitration award entered in Wells's favor is a cognizable injury for the purposes of the instant malpractice action. *See Ammon v. McCloskey*, 655 A.2d 549, 553 (Pa. Super. Ct. 1995) (holding that entry of a negligently-obtained judgment, standing alone, establishes a cognizable injury in a malpractice action). However, as explained above, NJM elected to satisfy this award via a settlement payment that arguably encompassed two separate sources of liability. Discovery on NJM's alleged bad faith conduct therefore is permitted to establish which portion of the settlement payment in excess of the policy limits went to extinguish each respective source of liability, as NJM can recover only "actual losses" in a malpractice action. *Kituskie v. Corbman*, 714 A.2d 1027, 1030 (Pa. 1998). Accordingly, NJM's relevant injury is the arbitration award, and a cognizable theory of damages is the portion of the settlement payment in excess of the policy limits that went to satisfy this outstanding arbitration award. Any contributory negligence defense therefore must be related to the *injury* for which NJM complains. *See Angelo v. Diamontoni*, 871 A.2d 1276, 1280 (Pa. Super. Ct. 2005) (noting the burden is on defendant to show plaintiff's conduct bears "a causal relationship . . . to the *injuries* for which damages are sought") (emphasis added); *Fahringer v. Rinehimer*, 423 A.2d 731, 733 (Pa. Super. Ct. 1980).

Thus, the Court will grant NJM's Motion for Partial Summary Judgment and strike Defendants' bad faith contributory negligence defense only to the extent that NJM's bad faith conduct is not causally related to the pertinent injury–the arbitration award. Defendants may still pursue theories of contributory negligence, including theories based on NJM's conduct that could also be characterized as acting in bad faith, so long as that conduct bears a causal relationship to the arbitration award.[7]

---

[7]    For example, if NJM refused to follow Brady's instructions regarding how to handle the Wells arbitration, such a refusal might be considered "bad faith conduct," but it also might be a cognizable contributory negligence defense if such a refusal contributed to the arbitration award. *See Gorski v. Smith*, 812 A.2d 683, 703-04 (Pa. Super. Ct. 2002).

**B.     Defendants' Motion to Compel**

Defendants seek to compel NJM to produce documents that it claims are subject to the attorney-client privilege and/or work-product protection. (Doc. 31.) The withheld documents, as identified in the privilege log (Doc. 31-4), fall into two broad categories: NJM documents (NJM 3876 - NJM 4097) and documents in the Curtin & Heefner file (CH00001 - CH16270). At the December 22, 2016 hearing, the parties agreed to the Court conducting an *in camera* review of the NJM documents to assess whether they are in fact privileged.

The parties continue to dispute whether the privilege log entries for the Curtin & Heefner file are sufficiently detailed and whether communications that relate to the resolution of the Wells claim have been waived. After conducting an *in camera* review of the NJM file, the Court concludes that documents NJM 4005-4006, 4013-4022, 4048-4050, 4051-4052, and 4060 are discoverable, as they either do not qualify for the protection claimed or the privilege has been waived. The rest of the documents in the NJM file are privileged from disclosure and not subject to a waiver. With respect to the documents in the Curtin & Heefner file, the Court concludes that the privilege log entries are insufficiently detailed because the Attorney Client Communication entries do not contain specific sender and recipient information, and the Attorney Work Product entries do not state the specific party who created the work product. Additionally, the descriptions are too vague to permit the Court to find that each element of the privilege claimed is satisfied. NJM therefore must supplement its privilege log with this information in order for the Court to determine whether the documents are in fact privileged.

### 1.     The Attorney-Client Privilege and Work-Product Doctrine

The attorney-client privilege and work-product doctrine are "exception[s] to the general rule that relevant evidence is admissible." *Rhone–Poulenc Rorer, Inc. v. Home Indem. Co.*, 32 F.3d 851, 862 (3rd Cir. 1994). The attorney-client privilege is established if the following elements are satisfied: (1) a communication (2) is made between privileged persons (3) in confidence (4) for the purpose of obtaining or providing legal assistance for the client. *In re*

*Teleglobe Commc'ns Corp.*, 493 F.3d 345, 359 (3d Cir. 2007).[8] "'Privileged persons' include the client, the attorney(s), and any of their agents that help facilitate attorney-client communications or the legal representation." *Id.* The attorney-client privilege "operates in a two-way fashion to protect confidential client-to-attorney or attorney-to-client communications made for the purpose of obtaining or providing professional legal advice." *Gillard v. AIG Ins. Co.*, 15 A.3d 44, 59 (Pa. 2011). The party claiming privilege bears the burden of proving that the privilege applies. *EMC Ins. Co. v. Zicolello*, No. 4:13-cv-00825, 2014 WL 123687, at *2 (M.D. Pa. Jan. 14, 2014). However, once the party claiming privilege meets its burden, the party challenging the privilege bears the burden of demonstrating that a waiver of the attorney-client privilege has occurred. *Id.*

Separately, the work-product doctrine generally precludes a party from discovering "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." Fed. R. Civ. P. 26(b)(3)(A). Materials prepared in the ordinary course of business are not immune from discovery. *Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 138 (3d Cir. 2000). Unlike the attorney-client privilege, a valid assertion of work-product protection can be overcome by the party seeking discovery if it can show (1) a substantial need for the materials in order to prepare its case, and (2) it is unable to obtain the substantial equivalent without undue hardship. *Id.* However, work product that contains the "mental impressions, conclusions, opinion, or legal theories of an attorney or other representative of a party concerning the litigation" is considered to be "core" work product and is "afforded near absolute protection from discovery." *In re Cendant Corp. Sec. Litig.*, 343 F.3d 658, 663 (3d Cir. 2003) (citation omitted). "[T]he doctrine requires only that the material be prepared in anticipation of *some* litigation, not necessarily in anticipation of

---

[8]    By Pennsylvania statute, "[i]n a civil matter counsel shall not be competent or permitted to testify to confidential communications made to him by his client, nor shall the client be compelled to disclose the same, unless in either case this privilege is waived upon the trial by the client." 42 Pa. Cons. Stat. Ann. § 5928.

the particular litigation in which it is being sought." *Cottillion v. United Refining Co.*, 279 F.R.D. 290, 302 (W.D. Pa. 2011) (emphasis in original). The party claiming work product protection has the burden of establishing the elements of the doctrine. *See Berry v. Ohio Cas. Ins. Co.*, No. 3:14-1262, 2015 WL 4066683, at *4 (M.D. Pa. July 2, 2015).

### 2.   The NJM Documents

#### a. Claim Notes

NJM claims the redacted portions of its claim notes are privileged under both the work-product doctrine and attorney-client privilege. After conducting an *in camera* review, the Court concludes that NJM has properly identified portions of the Wells claim file subject to the work-product protection and properly withheld them from discovery.

The redacted portions of the claim notes contain the mental impressions and strategies of NJM's attorneys and representatives, and were authored by an NJM attorney or claim handler. *See In re Cendant Corp. Sec. Litig.*, 343 F.3d at 663. Additionally, the claim notes were made in anticipation of litigation. *See Garvey v. Nat'l Grange Mut. Ins. Co.*, 167 F.R.D. 391, 393 (E.D. Pa. 1996) ("The general rule for determining whether a document was prepared in anticipation of litigation is whether the document can fairly be said to have been prepared or obtained because of the prospect of litigation."). The parties' state of mind evidences a subjective anticipation of litigation, and this anticipation was "objectively reasonable." *Berry*, 2015 WL 4066683, at *5. The Court thus concludes that these documents are protected under the work-product doctrine.

Because the Claim Notes in the NJM file are protected under the work-product doctrine, Defendants may obtain discovery of these materials only if they demonstrate (1) substantial need for the materials in order to prepare for their case, and (2) they are unable to obtain the substantial equivalent by other means without suffering undue hardship. *Holmes*, 213 F.3d at 138; *see* Fed. R. Civ. P. 26(b)(3). However, Defendants have not specifically articulated either substantial need or undue hardship, instead focusing their

briefs on the relevancy of the information sought and theories of waiver.[9] Moreover, much of the redacted content concerns opinions and impressions, which are subject to even greater work-product protection. Furthermore, Defendants have obtained deposition testimony on the subject at issue from NJM representatives, which indicates they have the ability to obtain the substantial equivalent of the work product they seek. *See Garvey*, 167 F.R.D. at 394. Therefore, Defendants are not entitled to discovery of the privileged Claim Notes (NJM 3876-3893).

### b.   Brady's Correspondence to NJM

Documents NJM 4048-4050 and NJM 4051-4052 are letters written by Brady to John Basgil, an NJM representative, concerning post-arbitration strategy while Brady was still representing NJM. NJM has waived its attorney-client privilege with respect to confidential communications its representatives made to Brady by filing the instant malpractice suit. *See EMC Ins. Co.*, 2014 WL 123687, at *2 (citing *Rhone–Poulenc Rorer, Inc.,* 32 F.3d at 862). Additionally, because the documents at issue are the work-product of Brady, NJM cannot claim privilege on this ground. *See Rhone–Poulenc Rorer, Inc.*, 32 F.3d at 866 ("[T]he work product doctrine belongs to the professional, rather than the client."). No interest that the work-product doctrine is designed to protect would be furthered by keeping an attorney's own work product privileged from his request for production. *See Westinghouse Elec. Corp. v. Republic of the Philippines*, 951 F.2d 1414, 1428 (3d Cir.1991) (explaining that the underlying rationale for the work-product doctrine is to promote the adversary system by allowing attorneys to prepare their cases without fear that their own work product will be used against them by their adversaries). For this reason, courts generally do not allow an attorney to withhold work product from her own client. *See, e.g.*, *Gottlieb v. Wiles*, 143 F.R.D. 241, 247 (D. Colo. 1992). Thus, to the extent that a client can claim to be an independent holder of the work-product protection, such a claim is waived when the client files a malpractice suit

---

[9]   Defendants' Brief in Support of its Motion to Compel (Doc. 32) also focuses on Pennsylvania Rule of Civil Procedure 4003.3, which is inapplicable in this federal diversity action. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

against the attorney that created the work product, and the work product relates to the subject of the malpractice suit. Accordingly, these documents must be disclosed.

Additionally, NJM 4060 is an email correspondence between Brady and NJM representatives regarding a petition drafted by Brady. As noted above, NJM waived its attorney-client privilege by filing this suit against Brady. Therefore, this email communication must be disclosed.

### c.   Brady's Draft Complaint

NJM 4013-4022 is a draft petition requesting the arbitration award be vacated and/or modified. Brady's law firm seal is affixed in the top left corner, along with Brady's attorney I.D. number. Additionally, Brady's signature block is listed at the end of the petition. Although there is some suggestion that Brady was not the author of this draft, NJM has not met its burden of proving this document was created by someone representing NJM other than Brady. As explained above, NJM cannot withhold Brady's own work product from discovery by raising the work-product protection. NJM 4013-4022 therefore must be disclosed.

### d.   NJM 4005-4006

NJM 4005-4006 is a two-page document that was emailed by Buurma to Jeffrey Bartolino, Mitch Livingston, and Daniel Toadvine, apparent members of NJM's in-house legal and executive team. The purpose of the correspondence was to provide self-described "background research," and to prepare the parties for an upcoming meeting. The Court concludes that this document is protected by both the attorney-client privilege and the work-product doctrine. However, NJM apparently disclosed this document to Defendants during discovery. (*See* Def.'s Mot. to Compel Ex. D, at P3496-P3497, Doc. 31.) NJM does not claim that this document was inadvertently disclosed, and the Court therefore concludes that it was a voluntary disclosure constituting an express waiver. *See Greater N.Y. Mut. Ins. Co. v. Phila. Indem. Ins. Co.*, No. 1:11-CV-00451, 2014 WL 939454, at *5 (M.D. Pa. Mar. 11, 2014) (citing *Westinghouse Elec. Corp.*, 951 F.2d at 1424). This document is therefore discoverable. But, for the reasons detailed *infra* Part III.B.2.e, this express waiver does not constitute a complete subject matter waiver, and the waiver will be limited to this document

only.

In sum, after performing an *in camera* review of the entire NJM file, the Court finds that only documents NJM 4005-4006, 4013-4022, 4048-4050, 4051-4052, and 4060 are discoverable. These documents must be produced.

> **e.     The Attorney-Client Privilege Has Not Been Waived with Respect to the Remaining Documents in the NJM File**

Defendants argue that NJM waived its attorney-client privilege with respect to all communications that pertain to the resolution of the Wells UIM claim because it voluntarily disclosed an attorney-client communication during the depositions of two of NJM's in-house attorneys. (Defs.' Reply Br. 5, Doc. 40.) Additionally, Defendants contend that communications pertaining to the resolution of the Wells claim have been waived because NJM asserted the advice of counsel (Curtin & Heefner) as the justification for why it decided to settle with Wells, thereby placing its outside counsel's advice at issue in the instant litigation. (Defs.' Br. in Supp. 5-7, Doc. 32.)  NJM argues that it has not waived the attorney-client privilege because it is the Defendants who seek to base their affirmative defenses on NJM's privileged communications. (Pl.'s Br. in Opp'n 5-8, Doc. 36.) The Court concludes that NJM has not waived its attorney-client privilege with respect to the remaining documents in the NJM file.

The first theory of waiver advanced by Defendants is direct or express waiver. Defendants contend that the deposition testimony of Buurma and Bartolino, both in-house attorneys for NJM, concerning a document that predominantly contains legal research waived the privilege with respect to "all of the opinions and all documentation concerning the opinions on this issue." (Defs.' Reply Br. 5.) In its privilege log, NJM claimed that this document was protected under both the attorney-client privilege and the work-product doctrine (*see* Doc. 31-4, at NJM 4005-4006), and does not offer an explanation for why this document was disclosed to Defendants.

The relevant deposition testimony of Bartolino states:

> Reliance   on   this   document   [NJM   4005-4006]   and   the

> discussions we had with counsel, as painful as it was, we came to the conclusion that th[e] arbitration award was going to be binding. . . . we were not going to make frivolous arguments despite the amount of money that was involved here. There was no doubt in our minds that this award was etched in stone.

(Defs.' Mot. to Compel Ex. D, 117:8-19, Doc. 31.) Additionally, when asked why NJM believed the $5.9 million arbitration award was binding as a matter of law, Bartolino stated, "A detailed analysis from our counsel, Curtin & Heefner, of the case law that applied to that issue. . . ." (*Id.* 109:9-11.)

The relevant deposition testimony of Buurma states:

> We relied upon the advice of Bonnie Stein [in deciding to withdraw the pending motions challenging the arbitration award]. We . . . reached a consensus as to what the probable outcome was—the likely outcome was of the pending pleadings and the mediator[']s analysis was also figured into it.

(Defs.' Mot. to Compel Ex. C, 146:3-8, Doc. 31.)

The document referred to in Bartolino's testimony (NJM 4005-4006) contains NJM's counsel's research on molding arbitration awards and bad faith liability under Pennsylvania law. The document consists of brief descriptions of relevant case law, the holdings of those cases, and relevant statutory language. Furthermore, the document contains at least one clear instance of an attorney's opinion, which states: "Thus, in my opinion, if the arb. Award is molded to $2 million, then we could still argue that Plaintiff [Wells] would not be entitled to the remaining $4 million as compensatory damages for breach of contract." It is unclear from the document whose opinion this is, but all three authors are attorneys who were representing NJM.

As explained by the Third Circuit in *Westinghouse Electric Corp. v. Republic of the Philippines*, 951 F.2d 1414, 1424 (3d Cir.1991), "once a client has revealed privileged information to a third party, the basic justification for the privilege no longer applies." Thus, under certain circumstances, courts have found that the "voluntary disclosure of a communication protected by the attorney-client privilege may result in waiver of the privilege for *all* communications pertaining to the same subject matter." *Greater N.Y. Mut. Ins. Co.*, 2014 WL 939454, at *5 (emphasis in original); *see Murray v. Gemplus Int'l, S.A.*, 217 F.R.D.

362, 366 (E.D. Pa. 2003). However, "the disclosure of confidential attorney-client communications does not constitute a waiver of any other confidential communications between a client and counsel where there is no apparent prejudice to the party seeking further disclosure." *Murray*, 217 F.R.D. at 366 (citation omitted). "Where one party attempts to utilize the privilege as an offensive weapon, selectively disclosing communications in order to help its case, that party should be deemed to have waived the protection otherwise afforded it by the privilege it misused." *Id.* at 367. In deciding whether the waiver of a voluntarily disclosed communication also extends that waiver to any related but undisclosed communications, the "touchstone is fairness." *In re Teleglobe Commn'cs Corp.*, 493 F.3d 345, 361 (3d Cir. 2007). Therefore, "when the disclosure does not create an unfair advantage, courts typically limit the waiver to the communications actually disclosed." *Id.*

With respect to the deposition testimony raised by Defendants as evidence of an express waiver, nothing stated by either Bartolino or Buurma equates to the divulgence of the content of confidential communications. *See Greater N.Y. Mut. Ins. Co.*, 2014 WL 939454, at *5 (finding deponent did not divulge confidential information by testifying that she discussed the company's insurance policy limits with counsel); *see also Astrazeneca LP v. Breath Ltd.*, No. 08-1512 (RBK/AMD), 2010 WL 11428457, at *6 (D.N.J. Aug. 26, 2010) (finding party's testimony that she consulted with her attorney did not waive attorney-client privilege). Accordingly, the Court finds no express waiver based on the content of the deposition testimony itself. However, the disclosed document at issue appears to constitute both an attorney-client communication and attorney work-product. NJM has admitted as much by designating it on its privilege log under both forms of privilege. (Doc. 34-1, at NJM 4005-4006.) Because it has been voluntarily disclosed to Defendants, any such privilege has been waived. *See In re Teleglobe Commn'cs Corp.*, 493 F.3d at 361; *Maldonado v. N.J. ex rel. Admin. Office of Courts-Prob. Div.*, 225 F.R.D. 120, 131-32 (D.N.J. 2004) (citations omitted) (noting that a voluntary disclosure to any third party generally waives attorney-client privilege, and disclosure of work-product to an adversary can waive the work-product protection). But although NJM waived its privilege with respect to this document, there is no

suggestion that NJM's disclosure gives it an unfair advantage or is prejudicial to Defendants. *See Dalmatia Import Grp., Inc. v. FoodMatch, Inc.*, No. 16-2767, 2016 WL 5930900, at *4 (E.D. Pa. Oct. 12, 2016) (rejecting request for a complete subject matter waiver when moving party failed to specify how the partial waiver had created an unfairness in the particular circumstances of the lawsuit). In fact, NJM's disclosure of this document may benefit Defendants' case, to the extent that it sheds any light on NJM's exposure to bad faith liability. Accordingly, the Court does not find that the disclosure of this document warrants extending the waiver to any related yet undisclosed communications because no unfair advantage has been created by virtue of the disclosure.

The second theory of waiver advanced by Defendants is an implied waiver due to NJM placing its counsel's advice at issue in the instant litigation. Defendants claim that Bartolino and Buurma asserted the advice of counsel as a defense in their respective deposition testimony, specifically, that NJM decided to withdraw its pending motions and settle the case with Wells based on the advice of their attorneys at Curtin & Heefner. (Defs.' Br. in Supp. 6, Doc. 32; Defs.' Reply Br. 5, Doc. 40.) In addition to the testimony quoted above, Defendants also cite to a portion of the Bartolino deposition in which he states that a decision was made to withdraw the petitions challenging the arbitration award after a:

> [F]airly lengthy meeting with Ms. Stein and Mr. Guarrieri [of Curtin & Heefner], and the decision we came to and it didn't involve a lot of struggling, not based on case law that was cited to us and discussed in detail, was that the entirety of that award was going to be binding on NJM and our petition would be–was–was unavailing.

(Defs.' Mot. to Compel Ex. D, at 111:16-22, Doc. 31.) Citing this testimony, Defendants contend that a party testifying that a decision was made based on an attorney-client communication effectively discloses that communication. (Defs.' Br. in Supp. 7, Doc. 32.)

Under the "at issue" waiver doctrine, "a party can waive the attorney-client privilege by asserting claims or defenses that put his or her attorney's advice in issue in the litigation." *Greater N.Y. Mut. Ins. Co.*, 2014 WL 939454, at *7 (citing *Rhone–Poulenc Rorer, Inc.*, 32 F.3d at 863). However, an attorney's "[a]dvice is not in issue merely because it is relevant,

24

and does not necessarily become in issue merely because the attorney's advice might affect the client's state of mind in a relevant manner." *Rhone–Poulenc Rorer, Inc.*, 32 F.3d at 863. Rather, "[t]he advice of counsel is placed in issue where the client asserts a claim or defense, and attempts to prove that claim or defense by disclosing or describing an attorney client communication." *Id.*; *see Piazza v. Cty. of Luzerne*, No. 3:13-CV-1755, 2015 WL 6690090, at *3 ("*Rhone–Poulenc* identifies a two-step inquiry into whether the privilege has been waived due to advice of counsel: '(1) the assertion of a claim or defense, and (2) an attempt to prove that claim or defense by disclosing or describing an attorney client communication'" (quoting *Nesselrotte v. Allegheny Energy, Inc.*, No. 06-01390, 2008 WL 2858401, at *6 (W.D. Pa. July 22, 2008))); *see also Astrazeneca LP*, 2010 WL 11428457, at *6 (quoting *Rhone–Poulenc Rorer, Inc.*, 32 F.3d at 863) (declining to find an implied waiver when a party has not asserted as an "essential element" of its defense that it relied upon the advice of counsel). Thus, even if the client's state of mind is in issue in the litigation, and even if the communications sought are "vital, highly probative, directly relevant or even go to the heart of the issue," they cannot be disclosed if they are protected by the attorney-client privilege unless the client takes an "affirmative step" that waives the privilege. *Rhone–Poulenc Rorer, Inc.*, 32 F.3d at 863, 864.

The Court concludes that NJM has not waived its privilege with respect to the confidential communications in the NJM file by affirmatively placing its attorneys' advice at issue. First, NJM is not attempting to prove a claim or defense by disclosing or describing an attorney-client communication. Rather, it is the Defendants who seek confidential communications between NJM and Curtin & Heefner to ultimately support their own defenses that (1) NJM would have successfully molded the arbitration award to the policy limits had it not elected to settle, and (2) NJM was motivated to settle because of its exposure to bad faith liability. *See EMC Ins. Co. v. Zicolello*, No. 4:13-cv-00825, 2014 WL 123687, at *5 (M.D. Pa. Jan. 14, 2014) ("Here, Defendants seek [plaintiffs' attorney's] confidential advice to his clients regarding their chances of success, in order to prove that the lost appeal was futile. In other words, it is Defendants, not Plaintiffs, who are attempting

to prove a defense by virtue of the confidential communication between Plaintiffs and [their attorney]. This does not comport with the definition of 'in issue' provided by the Third Circuit for purposes of waiving the privilege for advice from an attorney."); *see also Cottillion v. United Refining Co.*, 279 F.R.D. 290, 302 (W.D. Pa. 2011) (finding no waiver when defendant asserted reliance on the advice of counsel as the reason for attempting to alter the benefits paid to plaintiffs because defendant was not attempting to prove a defense based upon any communication it had with counsel); *cf. Piazza*, 2015 WL 6690090, at *3 (finding a waiver when defendant asserted he fired the plaintiff based on the advice of counsel because the propriety of the termination was a defense to the plaintiff's unlawful termination claims). Because NJM has not taken an affirmative step to place the advice of counsel in issue in order to prove an essential element of its malpractice claim or any defense, the Court concludes it has not implicitly waived the attorney-client privilege with respect to the confidential communications in the NJM file. *See Robertson v. Allstate Ins. Co.*, No. A. 98-4909, 1999 WL 179754, at *5 (E.D. Pa. Mar. 10, 1999) (finding no waiver when client did not take an "affirmative step" to place the advice of in-house counsel at issue); *see also Fid. & Deposit Co. of Md. v. McCulloch*, 168 F.R.D. 516, 520 (E.D. Pa. 1996) ("[Plaintiff] asserts no claim or defense in its Complaint or in any of its Responses to Defendants' Counterclaims that rests on the advice of counsel, nor does it attempt to prove any claim or defense by disclosing such advice.").

Second, just as the content of the deposition testimony of Bartolino and Buurma does not constitute an express waiver, it also does not place the confidential communications sought "at issue" in the litigation. No testimony cited by Defendants disclosed or described the details of any confidential communication made between NJM and Curtin & Heefner. *See EMC Ins. Co.*, 2014 WL 123687, at *5. The mere fact that a party states that it relied on the advice of counsel in making a decision, standing alone, does not show that the party took an "affirmative step" to place that advice in issue. *Rhone–Poulenc Rorer, Inc.*, 32 F.3d at 863; *see Astrazeneca LP*, 2010 WL 11428457, at *6 (concluding that a party stating in her testimony that she had consulted with attorneys does not equate to placing the advice of

counsel in issue); *Aull v. Cavalcade Pension Plan*, 185 F.R.D. 618, 630 (D. Colo. 1998) (finding defendant's deposition testimony that she relied on advice of counsel in denying plaintiff's claim did not establish a waiver because that statement did not indicate that the defendants took affirmative action to place the advice of counsel at issue). This is especially true when the deposition testimony on which an alleged waiver is based was elicited in response to questions posed by defense counsel. *See Robertson*, 1999 WL 179754, at *5 (noting it would defeat the purpose of the "at issue" exception if opposing counsel were permitted to lure deponents into placing the advice of counsel at issue). Accordingly, Defendants are not entitled to discovery of the documents in the NJM file designated as "Attorney Client Communication" on the basis of waiver.

### f. The Work Product Protection Has Not Been Waived with Respect to the Remaining Documents in the NJM File

Whether a client has or has not waived the attorney-client privilege does not determine whether he also waived the protection of the work-product doctrine. *Rhone–Poulenc Rorer, Inc.*, 32 F.3d at 866. Defendants can overcome an assertion of work-product protection only if they show substantial need and undue hardship in obtaining the substantial equivalent. *Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 138 (3d Cir. 2000); *see* Fed. R. Civ. P. 26(b)(3). However, even if Defendants were able to show a substantial need, they do not advance a reason for why they are unable to obtain the substantial equivalent without suffering undue hardship. Defendants are able to engage in other forms of discovery related to NJM's decision to settle with Wells and NJM's bad faith handling of the Wells claim as it relates to the damages NJM presently seeks.

### 3. The Curtin & Heefner Documents

The Court has not conducted an *in camera* review of the voluminous Curtin & Heefner file, and therefore must rely on NJM's privilege log in order to assess its claims of privilege. Defendants challenge the sufficiency of the privilege log and raise the same arguments for waiver as detailed above. Because the Court finds the privilege log insufficient with respect to the Curtin & Heefner documents, NJM will be ordered to supplement its log. Thereafter,

the Court will provide Defendants another opportunity to raise a challenge to the sufficiency of the log, if they so choose.

### a.   A More Detailed Privilege Log Is Required

Under Federal Rule of Civil Procedure 26(b)(5), a party withholding information on the ground that it is privileged must claim the privilege expressly and "describe the nature of the documents, communications, or tangible things not produced or disclosed–and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Specific to a claim of attorney-client privilege, "the description of each document and its contents must be sufficiently detailed to allow the court to determine whether the elements of attorney-client privilege have been established." *SmithKline Beecham Corp. v. Apotex Corp.*, 232 F.R.D. 467, 475 (E.D. Pa. 2005) (citation omitted). In general, a privilege log typically must "identify each document and the individuals who were parties to the communications, providing sufficient detail to permit a judgment as to whether the document is at least potentially protected from disclosure." *Id.* at 482 (citation omitted). The party asserting the privilege has the burden of showing that the elements of the privilege are met. *Teltron, Inc. v. Alexander*, 132 F.R.D. 394, 395 (E.D. Pa. 1990).

NJM's privilege log contains the following details: the withheld document's identifying number; the relevant date for every Curtin & Heefner document; a brief description of the withheld document; and the privilege designation (either "Attorney Client Communication" and/or "Attorney Work Product"). (Doc. 31-4.) NJM supplemented its log with affidavits from Bonnie Stein, Nathan Buurma, and Jeffrey Bartolino. (*See* Pl.'s Br. in Opp'n Exs. A-C, Doc. 36.) Stein's Affidavit states that the Curtin & Heefner file contains numerous legal documents and internal communications, many of which had never been produced to NJM during Curtin & Heefner's involvement with the Wells claim and arbitration. The Buurma and Bartolino Affidavits both attest that their communications were made for the purpose of securing or providing legal advice and not made "in the presence of strangers."

The redacted emails in the NJM file were provided to Defendants and the Court. (*See* Defs.' Mot. to Compel Ex. B., Doc. 31.) These emails left the sender and recipient lines

unredacted, allowing Defendants and the Court to view the specific parties to the communication. However, the Court has not been presented with any redacted emails in the Curtin & Heefner file which allow it to ascertain the specific sender and recipient. Instead, the privilege log uses the general term "in-house counsel" or "client" to describe which NJM representative(s) was a party to the email and does not state which member(s) of the Curtin & Heefner team was a party to the correspondence. It is unclear if NJM has provided Defendants with the specific sender and recipient information for the emails in the Curtin & Heefner file. Similarly, the documents withheld on the ground of Attorney Work Product do not specify the parties who created the work product being withheld.

NJM must supplement its log to include the specific sender and recipient information for the emails listed in the Curtin & Heefner file, and the names and titles of the specific person(s) who prepared the work product being withheld. *See SmithKline Beecham Corp.*, 232 F.R.D. at 477-78 (finding privilege log entries insufficient because they did not identify a specific attorney with whom a confidential communication was made). Additionally, the descriptions are too vague for the Court to find that NJM has met its burden of proving that each element of the privilege is satisfied. NJM must provide more detailed descriptions explaining the contents of the documents withheld in the Curtin & Heefner file. *See Lady Liberty Transp. Co., Inc. v. Phila. Parking Auth.*, No. 05-1322, 2007 WL 707372, at *2 (E.D. Pa. Mar. 1, 2007). Only then will the Court be able to properly assess its claim of attorney-client privilege and/or work-product protection.

## IV. Conclusion

For the above stated reasons, NJM's Motion for Partial Summary Judgment will be GRANTED in part and DENIED in part. Defendants are not precluded from conducting further discovery related to NJM's bad faith handling of the Wells claim. However, any bad faith contributory negligence defense that is not causally related to the arbitration award fails as a matter of law. Defendants' Motion to Compel will be GRANTED in part and DENIED in part. NJM is hereby compelled to produce NJM documents 4005-4006, 4013-4022, 4048-4050, 4051-4052, and 4060. All other documents in the NJM file listed in the privilege log are

privileged from discovery and not subject to waiver. Additionally, NJM is required to supplement its privilege log within fourteen (14) days with the specific sender and recipient information for all documents in the Curtin & Heefner file listed as an Attorney Client Communication. NJM must also specify which attorney(s) prepared the documents listed as Attorney Work Product in the privilege log. Additionally, NJM must provide more detailed descriptions explaining the contents of the documents withheld in the Curtin & Heefner file that allow the Court to determine whether each element of the privilege claimed is satisfied. After the privilege log has been supplemented, the Court will provide Defendants another opportunity to raise a challenge to the sufficiency of the log, if they so choose.

An appropriate order follows.

January 20, 2017                                             /s/ A. Richard Caputo
Date                                                                    A. Richard Caputo
                                                                          United States District Judge

30